United States District Court
District Of Maine

| | |
|---|---|
| David E. Murray, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Docket No. 2:15-cv-00484-DBH |
| Wal-Mart Stores, Inc. et al. ) | |
| ) | |
|     Defendants. ) | |

**First Amended Complaint and Demand For Jury Trial**

**Summary of the Action**

1. This is a retaliation and employment discrimination action brought by an award-winning Wal-Mart Market Manager who stood up to other Market Managers for repeatedly making racist and sexist comments and engaging in other illegal discrimination. For example, David Murray opposed and reported Market Managers for repeatedly making derogatory comments about Barack Obama and other black people, including using the racial epithet "nigger;" and for frequently making demeaning and derogatory comments about female employees, including those they wanted to have sex with and a Store Manager they derided for being a lesbian.

2. Murray followed Walmart policy and reported this illegal activity

up the chain of command, but his complaints were not investigated promptly and appropriate corrective actions were not taken. Instead, his supervisor brushed off Murray's whistleblower reports and instead supported the other two Market Managers in retaliating against Murray for his protected activities opposing unlawful discrimination. After Murray filed a formal discrimination complaint with Wal-Mart headquarters, his hostile and abusive work environment become increasingly severe in 2014 and the retaliation expanded to include Wal-Mart Legal and other high-level Wal-Mart officials.

3.   In 2015, Murray was constructively discharged.  As a result of Wal-Mart's intentional discrimination and retaliation, Mr. Murray is seeking all available remedies, including back pay and benefits, compensatory damages, punitive damages, injunctive relief, and attorney's fees and expenses.

3A.   Wal-Mart officially terminated Mr. Murray's employment effective October 5, 2016.

## Parties

4.   Plaintiff David E. Murray is a citizen of the United States and is currently a resident of Casco, Maine.

5. Defendant Wal-Mart Stores, Inc. is a corporation doing business in Maine.

6. Defendant Wal-Mart Stores East, LP is a limited partnership doing business in Maine.

7. The Defendants are referred to collectively in this Complaint as Wal-Mart.

### Jury Trial Demand

8. Under Me. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

### Facts

9. In about October 1993, Murray began working for Wal-Mart. He then worked hard to earn an excellent performance record at various locations throughout the country.

10. For example, in 2002 he was recognized as Regional Manager of the year for the New England Region out of 7 Regional Managers.

11. In 2003, he was recognized as Regional Manager of the year for the Total Company.

12. Murray and his wife moved five times to pursue new positions with Wal-Mart.

13. Murray's responsibilities for Wal-Mart required extensive travel and time away from home.

14. Due to his exemplary work ethic and strong managerial skills, he moved up the ladder of responsibility at Wal-Mart.

15. In 2006, Murray rose to the significant position of Market Manager in charge of about 8-10 stores in Maine.

16. In about 2010, Murray became concerned about two peer Market Managers in Maine who were making frequent discriminatory comments, including crudely disparaging comments about women and blacks.

17. Murray was concerned because these frequent discriminatory comments indicated that these Market Managers were illegally discriminating in the workplace against female employees and employees belonging to minority groups; these comments could lead to liability for Wal-Mart; and these comments were highly offensive to him personally.

18. For example, one of these Market Managers repeatedly made derogatory comments about Barack Obama and other black people, including the hateful racial epithet "nigger."

19. These Market Managers frequently referred to female employees by reference to their sexual attractiveness.

20. These Market Managers frequently bragged about their sexual exploitation of women.

21. One of these Market Managers made comments about a female subordinate having huge gaudy nipples.

22. One of these Market Managers frequently talked about female employees he wanted to have sex with.

23. He also frequently made derogatory comments about a particular female Store Manager being a lesbian.

24. Murray displeased the other two Marked Managers by expressing his disapproval of their racist and sexist comments when they were made.

25. The two Market Managers began retaliating against Murray because of his opposition to their discriminatory comments.

26. Murray made repeated complaints to his immediate supervisor about the discrimination and retaliation by the other two Market Managers. His supervisor was the Regional General Manager and Vice President of Operations.

27. But his immediate supervisor brushed off Murray's whistleblower and retaliation complaints without taking effective corrective action. Instead, the Regional General Manager looked the other way and sometimes even supported the other two Market Managers when the continued retaliating against Murray for opposing and reporting their unlawful discrimination.

28. For example, the immediate supervisor took no corrective action when Murray reported that one of the other Market Managers was repeatedly visiting stores in Murray's market where he would defame Murray to the employees and take photographs.

29. In September 2013 Murray filed a formal discrimination and harassment complaint with Wal-Mart headquarters.

30. Walmart, however, responded with months of false promises to investigate and haphazard reassignments of purported investigators. Wal-Mart also violated its own policies and retaliated against Murray by disclosing his complaint to officials in his region after he specifically requested that they not do so.

31. Wal-Mart did not begin investigating the September complaint until mid-December.

32. Wal-Mart did not complete its investigation until late February.

33. During a phone conversation on February 7, 2014, the Executive Vice President of HR for Walmart US, Kristin Oliver, told Murray that "there are some things in your environment, relationships with your peers and supervisor that are concerning and we are prepared working on what we are going to do to take action to stop the behavior and deal with any discipline we see appropriate. Any discipline that we think is appropriate. With that said… I will talk to [your supervisor] sooner than later as well as face to face

6

meetings. Can't give you details how we dealt with it but will take the appropriate action for what we saw."

34. Wal-Mart officials, including Ben Newton (Ethics Team), Jill Wesbecher (Executive Open Door Team) and Kristin Oliver (EVP Walmart US People), admitted to Murray that his September complaint was not handled properly by Walmart.

35. Wal-Mart did not take effective corrective action in response to Murray's September 2013 discrimination complaint or his supplemental complaints after then.

36. The hostile and abusive work environment created by Murray's supervisor and the two other Market Managers became increasingly severe in 2014. The retaliation also expanded to include Wal-Mart Legal and other high-level Wal-Mart officials.

37. For example, in early February 2014, Murray's market was realigned to favor the other two Market Managers.

38. Despite Murray's objectively outstanding results, on March 31, 2014, the supervisor retaliated against Murray by giving him a worse annual evaluation than the year before. For example, despite his exemplary profit rating at the 97.40% percentile for market managers, his review had an overall rating of 0.00%. Similarly, his rating for Leadership: Execution and Results went from an Exceeds Expectations to a Development Needed.

7

39. On June 2, 2014, Murray filed a detailed charge of employment discrimination and retaliation against Wal-Mart with the Maine Human Rights Commission (MHRC) and the federal Equal Employment Opportunity Commission (EEOC). That charge is attached and incorporated by reference.

40. In June 2014, Walmart Legal notified Mr. Murray that because he had an EEOC charge with similar allegations to his internal EEO complaint that Walmart would not address the internal complaint.

41. This notice was given based on a Wal-Mart policy of refusing to address internal discrimination complaints by current employees after they file a complaint with the EEOC.

42. This policy that has the obvious effect of penalizing current employees who file a charge with the EEOC.

43. On July 9, 2014, Walmart Legal sent an email, which referred to Murray's EEOC charge, to two of Murray's subordinates, a store manager and an hourly personnel coordinator.

44. This unnecessary disclosure of Murray's EEOC charge undermined Murray's authority and reputation with his subordinates.

45. In August 2014, Murray's supervisor made a disparaging reference to Murray about "older cashiers" workers only being half as productive as "college kids. This same supervisor sent Murray an email stating that Murray was "too old to shovel snow."

46. Wal-Mart made false statements in its official Answer filed with the Maine Human Rights Commission in October 2014. For example, Walmart denied that it was aware of Murray's sleep apnea disability. On or before 2012, Wal-Mart accepted an official Walmart ADA form from Murray documenting his sleep apnea and need for reasonable accommodation for that disability.

47. Walmart's Answer with the MHRC also falsely alleges that its internal investigation found no substantiation of Mr. Murray's internal discrimination complaint.

48. In 2015, Wal-Mart officials denied Murray reasonable accommodation for his disabilities and discriminated against him because of his disabilities.

49. On March 9, 2015, Murray filed an amendment to his charge of discrimination with the MHRC and the EEOC. That amendment to the charge is attached and incorporated by reference.

50. After March 9, 2015, Wal-Mart continued to discriminate and retaliate against Murray.

51. For example, in April 2015, Wal-Mart's Regional HR Director for New England refused to engage in a good faith, interactive dialogue with Murray regarding his request for reasonable accommodation in connection with his approved medical leave for his medically documented disabilities.

9

52. In 2015, Wal-Mart constructively discharged Murray from his job.

52A. Wal-Mart officially terminated Murray's employment effective October 5, 2016.

52B. In a letter to Mr. Murray dated October 5, 2016, Wal-Mart's Regional Human Resources Director, Phil Morris, provided Mr. Murray with official notice from Wal-Mart of its decision to terminate his employment. Mr. Murray received this letter on October 7, 2016.

52C. The primary reason provided by Wal-Mart in its October 5, 2016 official notice of termination was that Mr. Murray's conduct of recording telephone communications with other Wal-Mart employees, without their knowledge, allegedly was "in violation of the Company's policies."

52D. Wal-Mart's October 5, 2016, notice of termination does not cite or refer to any specific policy of the Company that Mr. Murray allegedly violated by recording telephone communications with other Wal-Mart employees, without their knowledge.

52E. Wal-Mart had no policy in effect while Mr. Murray was making his recordings that clearly prohibited his conduct of recording telephone communications with other Wal-Mart employees, without their knowledge.

52F. On October 18, 2016, Wal-Mart Market Manager Kevin Robinson testified under oath that he has no knowledge of "any rule or policy

of Wal-Mart" that would prohibit a Wal-Mart employee from recording a confidential, work-related communication with other Wal-Mart employees and without the knowledge of those other employees. Deposition Transcript at page 294.

    52G.  On June 3, 2016, Mr. Murray's attorneys provided to Wal-Mart's attorneys copies of audio recordings made by Mr. Murray of phone conversations with other Wal-Mart employees.

    52H.  On June 10, 2016, Mr. Murray was questioned in detail at his deposition by Wal-Mart's attorney about his audio recordings of phone conversations with other Wal-Mart employees. Deposition Transcript at pages 138-142. Mr. Murray testified that in about September 2013 he began recording work-related phone conversations because of the "sexist and racist comments that were coming from two peers that I continuously addressed and had gone to my supervisor, which is a vice-president and officer of the company, [who] continued to assure me that he was addressing and obviously was not. And over time it continued to get worse and worse and worse. They were making my life hell." Deposition Transcript at page 141.

    52I.  Mr. Murray had a legal right under federal and state civil rights laws to record phone conversations with other Wal-Mart employees when he believed in good faith that these recordings could provide evidence of a

11

pattern of unlawful discrimination and retaliation in employment, including hostile work conditions.

52J. Mr. Murray never used the recordings he made of phone conversations with other Wal-Mart employees for any purpose other than as evidence to support his civil rights claims of unlawful discrimination and retaliation in employment.

52K. As of October 5, 2016, Wal-Mart had no factual basis to believe that Mr. Murray ever used the recordings he made of phone conversations with other Wal-Mart employees for any purpose other than as evidence to support his civil rights claims of unlawful discrimination and retaliation in employment.

52L. On September 29, 2016, Paul Busby, Wal-Mart's General manager and Vice President of Operations its Northern New England region (called Boston Metro), testified under oath that he would like David Murray back working as a Market Manager under Mr. Busby. Deposition Transcript at page 293.

52M. Mr. Busby further testified that "No" he was not surprised by the statement of Mr. Murray's former Market Assistant that "David Murray has the highest integrity and work ethic that I have ever seen." Mr. Busby explained his answer as follows: "No, David never did anything—his work

ethic was not suspect to me, or his level of integrity." Deposition Transcript at pages 316-317.

52N. A second reason provided by Wal-Mart in its October 5, 2016 official notice of termination was that Mr. Murray allegedly "failed to provide the Company with a genuine date of [his] return to work" when he submitted his request in November 2015 to extend his personal leave of absence for medical reasons through April 15, 2016 and when he submitted his request in April 2016 to further extend his medical leave through October 5, 2016.

52O. As of October 5, 2016, Wal-Mart had no reasonable basis to believe that Mr. Murray's primary care doctor intentionally lied on his written certification in support of Mr. Murray's applications for medical leave by providing Wal-Mart with dates for Mr. Murray's return to work that were not "genuine."

52P. It was not until October 4, 2016 that Wal-Mart first notified Mr. Murray that it was denying his November 2015 request to extend his personal leave of absence for medical reasons from January 20, 2016 to April 15, 2016 and his April 2016 request to extend his medical leave to October 5, 2016.

52Q. On November 21, 2015, Mr. Murray submitted his request to extend his personal leave of absence for medical reasons until April 15, 2016. His request was submitted in compliance with all Wal-Mart requirements,

13

including its official Personal LOA request forms and the Healthcare Provider/PCP's certification form.

52R. Beginning on December 7, 2015, Mr. Murray made repeated written requests to Wal-Mart that it act on his November 21, 2015 request for medical leave from January 20, 2016 through April 15, 2016. Wal-Mart never responded until October 4, 2016 and it then retroactively denied the application.

52S. Beginning on January 8, 2016, Mr. Murray's attorney made repeated requests in writing to the attorneys for Wal-Mart that Wal-Mart respond to Mr. Murray's November 21, 2015 request for a personal leave of medical absence through 4/15/16. Mr. Murray's attorney specifically explained that "Mr. Murray is concerned that the failure to date to approve his request beyond 1/19/16 is in retaliation for his protected complaints about unlawful employment discrimination, including this lawsuit."

52T. On January 29, 2016, Mr. Murray's attorney sent a written reminder to the attorneys for Wal-Mart that Wal-Mart "Mr. Murray still has not received a response from Walmart to his requests for a personal medical leave of absence from 1/19/16 to 4/15/16."

52U. On April 12, 2016, Mr. Murray submitted to Wal-Mart his request to extend his personal leave of absence for medical reasons until October 5, 2016. His request was submitted in compliance with all of Wal-

Mart's procedural requirements, including its official Personal LOA request forms and the Healthcare Provider/PCP's certification form.

52V.   On April 14, 2016, Mr. Murray's attorney sent a written request to the attorneys for Wal-Mart requesting that Wal-Mart respond to Mr. Murray's April 12, 2016 request for a personal leave of medical absence through October 5, 2016.

52W.   Until October 4, 2016, Wal-Mart and its attorneys never responded to any of these multiple requests by Mr. Murray and his attorneys for a response to his pending applications for a personal medical leave of absence.

52X.   On October 4, 2016, Walmart finally responded by retroactively denying Mr. Murray's applications for a personal medical leave of absence dating back to January 20, 2016.

53.   The many incidents of harassment and retaliation against Murray constitute a hostile and abusive work environment and are part of one unlawful employment practice.

54.   Wal-Mart acted with actual malice and reckless disregard for Murray's civil rights protected under state and federal anti-discrimination laws.

55.     On March 27, 2015 the MHRC issued a notice of right to sue to Murray under 5 M.R.S.A. § 4612(6) and § 4622(1)(C), authorizing him to pursue his case in court.

56.     Under 5 M.R.S.A. § 4622, Murray has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

57.     On May, 28, 2015, Murray received a right to sue notice from the EEOC. That notice was dated May 26, 2015 and was sent from the EEOC office in Boston, MA to Maine by US mail.

58.     Murray has exhausted his administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claim

59.     The allegations in paragraphs 1-58 are repeated.

60.     Wal-Mart retaliated against Murray because of his protected activities including his opposition to and complaints about discriminatory comments by other Market Managers; his internal complaints of illegal discrimination and retaliation; and his charges filed with the MHRC and the EEOC, in violation of 42 U.S.C § 1981; the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4634, the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. §§ 831-840., Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.*, and the American With Disabilities Act (ADA), 42 U.S.C. 12101 et seq.. Wal-Mart also discriminated against Murray because of his disabilities, in violation of the MHRA, the ADA, and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. §794. Wal-Mart engaged in unlawful discrimination against Murray by aiding and abetting unlawful discrimination against him and otherwise violating the MHRA, 5 M.R.S. § 4553(10)(D). Wal-Mart interfered with Murray's exercise and enjoyment of the rights granted and protected by the MHRA and otherwise violated the prohibitions in 5 M.R.S.A. § 4633. Murray is pursuing all possible methods of proving this discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

60A.   Wal-Mart officially terminated Murray's employment effective October 5, 2016 in retaliation for Mr. Murray filing and pursuing this lawsuit, for recording communications to support his claims of unlawful discrimination and retaliation, and for engaging in the other protected activities alleged more fully in paragraph 60 above.

61.   As a direct and proximate result of Wal-Mart's retaliation and discrimination against Murray, he has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, future lost

wages and benefits, adverse mental health conditions such as insomnia, anxiety, and depression, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life injury to reputation, and other pecuniary and non-pecuniary losses.

 62. Murray requests relief against Wal-Mart as follows:

 (a) Enter declaratory relief that Wal-Mart violated Plaintiff's statutory civil rights to be free of unlawful retaliation and unlawful disability discrimination;

 (b) Enter injunctive relief ordering Wal-Mart to provide effective civil rights training for all managerial and supervisory employees above Murray in the chain of command on the requirements of all applicable laws prohibiting employment discrimination and unlawful retaliation against employees for making reasonable reports of unlawful discrimination and that this training must be completed within 60 days of the entry of Judgment for Injunctive Relief:

 (c) Award Plaintiff lost wages and benefits and front pay for future lost wages and benefits;

 (d) Award Plaintiff compensatory damages in amounts to be determined at trial by the jury and prejudgment interest based on those damages;

(e) Award punitive damages against Wal-Mart in amounts to be determined at trial by the jury and prejudgment interest based on those damages;

(f) Award Plaintiff full costs and reasonable attorney's fees; and such further relief as is deemed appropriate.


Date: November 28, 2016                    Respectfully submitted,


/s/David G.Webbert
David G. Webbert

/s/Max I. Brooks
Max I. Brooks

Johnson, Webbert & Young, L.L.P.
160 Capital Street, P.O. Box 79
Augusta, Maine 04332-0079
(207) 623-5110
dwebbert@johnsonwebbert.com
mbrooks@johnsonwebbert.com

*Attorneys for Plaintiff*

## Certificate of Service

     I hereby certify that on November 28, 2016, a copy of the foregoing was served on the following attorney for Defendant at the address listed below:

    Ronald W. Schneider, Jr., Esq.
    rschneider@bernsteinshur.com

    Peter F. Herzog, Esq.
    pherzog@bernsteinshur.com


Date: November 28, 2016	/s/ David G. Webbert