# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **DAVID E. MURRAY,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. 2:15-CV-00484-DBH** |
| | ) | |
| **WALMART STORES INC., ET AL.,** | ) | |
| | ) | |
| **DEFENDANT** | ) | |


## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND THE PLAINTIFF'S OBJECTION TO ORDER ON MOTION TO SEAL

This is an employment discrimination case. The plaintiff-employee, David E. Murray (Murray), alleges that his employer (the defendants whom I refer to collectively as Walmart) retaliated against him for engaging in protected activity and discriminated against him on account of his age and disability. He seeks relief under Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act (ADA), the Maine Whistleblowers' Protection Act (MWPA), and the Maine Human Rights Act (MHRA). He also demands unpaid wages and benefits under Maine labor law.[1] Walmart filed a motion for summary judgment on all claims; Murray requested partial summary judgment on Walmart's failure-to-mitigate defense. I **GRANT** Walmart's motion for summary judgment. That ruling **MOOTS** Murray's motion for partial summary judgment.

---

[1] He also refers to 42 U.S.C. § 1981, but he is not a member of a minority group and therefore cannot seek relief under that statute.

Murray also objects to the Magistrate Judge's order granting in part and denying in part Walmart's motion to seal its summary judgment papers and exhibits. I **AFFIRM** the Magistrate Judge's order because it is not clearly erroneous or contrary to law.

## PROCEDURAL HISTORY

This case has been pending over four years. Murray cycled through two sets of lawyers before representing himself, requested and received numerous extensions of time, and attempted multiple amendments to his complaint. In August 2015, while Murray was still a Walmart employee, his lawyers filed this case in Maine Superior Court (Cumberland County). <u>See</u> Complaint (ECF No. 1-1). Walmart removed it to this court on November 24, 2015, asserting both federal question and diversity of citizenship jurisdiction. 28 U.S.C. §§ 1331, 1332; Defs.' Notice of Removal (ECF No. 1). Walmart then answered the complaint and discovery began. Defs.' Ans. (ECF No. 11); Scheduling Order (ECF No. 12).

In October 2016, Walmart fired Murray, prompting him to file an amended complaint the following month that incorporated allegations related to his termination. Report of Hearing and Order (ECF No. 33); First Am. Compl. (ECF No. 36). As discovery continued, Murray's lawyers terminated their representation in May 2017, citing "professional considerations" under Maine Rule of Professional Conduct 1.16. Pl.'s Counsels' Mot. for Leave to Withdraw (ECF No. 71). Murray missed a court-ordered deadline for retaining new counsel, but he requested an extension and explained that because of his medical conditions, "there was no way that [he] could represent [him]self Pro Se." Pl.'s

Mot. to Extend Time (ECF No. 74). He successfully retained a new lawyer in early July 2017. Notice of Appearance on Behalf of Murray (ECF No. 79).

Murray's new lawyer obtained multiple deadline extensions, one of them because the parties were engaged in settlement negotiations that they anticipated completing within 30 days. Joint Mot. to Stay Proceedings (ECF No. 87). A month and a half later, Murray's lawyer reported that the parties had been unable to reach a settlement. On November 29, 2017, he requested to withdraw his representation because of "[a]n irretrievable breakdown in the attorney-client relationship." Mot. to Withdraw (ECF No. 91); Order re: Status Conference (ECF No. 92). A Magistrate Judge gave Murray 30 days to find successor counsel or choose to proceed *pro se*. Order Granting Mot. to Withdraw (ECF No. 93). But Murray requested additional time, explaining that he was having difficulty retaining new counsel and attaching letters from his doctors in support of his claim that his medical conditions precluded him from representing himself. Pl.'s Mot. to Extend All Deadlines (ECF No. 94). On February 7, 2018, the Magistrate Judge—noting that the case by then was in its third year, following "numerous extensions," and it was "thus unsurprising that he has had difficulty retaining new counsel"—granted Murray a further extension, allowing him a total of 90 days to find a new lawyer after his prior counsel's withdrawal. Order Granting in Part & Denying in Part Mot. to Amend (ECF No. 100). As it turned out, Murray did not secure new counsel.

Next, proceeding *pro se*, Murray requested a settlement conference. Letter Requesting Settlement Conf. (ECF No. 101). The parties met with a Magistrate Judge for two days, followed by two additional meetings by phone and one more

in person. See Minute Entries re: Confs. (ECF Nos. 106, 107, 109, 112 & 117). They were unable to reach a settlement. At a conference in July 2018, a different Magistrate Judge denied Murray's request for additional time to secure a lawyer, and he set remaining pretrial deadlines. Order re: Non-Final Pretrial Conf. (ECF No. 123).

With the failure of the settlement conferences, the parties resumed discovery and motion practice. Denying an additional request from Murray for another stay while he continued to look for counsel, a Magistrate Judge noted that, as of August 24, 2018, "the parties jointly or separately requested and were granted 22 extensions. Six of those extensions stemmed from Murray's search for successor counsel. . . . This court has made every reasonable attempt to accommodate Murray's efforts to find first one successor counsel and then another." Mem. Dec. & Order on Mots. at 2, 5 (ECF No. 129). I denied Murray's objection to the Magistrate Judge's order, explaining that the Court had already been "very accommodating in allowing numerous extensions of deadlines" and that Murray had failed to give any indication that his condition was "likely to improve in the foreseeable future" or that he had "a plan for engaging counsel following his lack of success so far." Order Denying Obj. to Mem. Dec. & Order at 2 (ECF No. 155).

Murray filed a second amended complaint on September 26, 2018, adding factual allegations and state law claims for unpaid salary, paid time off, and executive compensation benefits. See Second Am. Compl. (ECF No. 159). On the same day, he moved to file a third amended complaint. Mot. to Amend Am. Compl. (ECF No. 160). The Magistrate Judge denied that motion, concluding

that Murray did not demonstrate good cause for his substantial delay in seeking to amend his complaint further and, to the extent he did have good cause, the claim he proposed was futile. Mem. Dec. & Order on Mot. to Amend (ECF No. 181).

Walmart filed its motion for summary judgment and supporting statement of material facts on April 29, 2019. Redacted Mot. for Summ. J. (ECF No. 196); Redacted Stmt. of Facts (ECF No. 197). Murray requested additional time for filing his response to the summary judgment motion, which the Magistrate Judge granted. Pl.'s Mot. to Extend Time (ECF No. 202); Order Granting Mot. to Extend Time (ECF No. 207). A day later, Murray filed a motion to stay all deadlines and, three weeks after that, submitted another motion for an extension. Mot. to Stay (ECF No. 211); Mot. to Extend Time (ECF No. 215). The Magistrate Judge ultimately granted Murray a further extension on July 12, 2019. Order Granting Mot. to Extend Time (ECF No. 222). But the day before, Murray filed a motion for partial summary judgment on Walmart's affirmative defense of failure to mitigate damages. Mot. for Partial Summ. J. & associated filings (ECF Nos. 224-27). Then, on the same day that the Magistrate Judge granted his motion for an extension, Murray filed a partial response to Walmart's statement of facts along with a statement of additional facts. Response to Stmt. of Facts with Stmt. of Add'l Facts (ECF No. 228). Murray's response addressed Walmart's facts numbered 1 through 173 but did not address facts 174 through 274. See id. Since he submitted his filings the day before and the same day as the Magistrate Judge granted his request for more time, the Magistrate Judge gave Murray the option of withdrawing those filings and submitting his responses by the newly

extended deadline or foregoing the extended deadline and standing by his existing responses. Order re: Resp. to Mot. for Summ. J. (ECF No. 231). Murray chose to stick with what he had already filed. Pl.'s Status Report at 4-5 (ECF No. 232).

The parties proceeded to submit replies and responses to the cross motions for summary judgment and accompanying statements of facts, although Murray has never filed a brief in opposition to Walmart's motion for summary judgment (despite submitting a partial response to Walmart's Statement of Material Facts) or a response to Walmart's facts numbered 174 through 274. See Defs.' Reply in Support of Mot. for Summ. J. (ECF No. 233); Defs.' Reply to Stmt. of Add'l Facts (ECF No. 234); Defs.' Opp. to Mot. for Partial Summ. J. & accompanying exhibits (ECF Nos. 235 & 236); Pl.'s Reply in Support of Mot. for Partial Summ. J. (ECF No. 239); Pl.'s Response to Defs.' Stmt. of Facts & accompanying exhibits (ECF Nos. 240 & 241). The cross-motions for summary judgment are now fully briefed and ready for decision.[2]

---

[2] It is apparent from Murray's many filings that he believes that his lawyers and this Court have treated him unfairly. As I have written previously, Murray's complaints about his lawyers are not part of this lawsuit and not Walmart's responsibility. Order on Pl.'s Mot. for Continuance & Stay at 2-3 (ECF No. 174). Whether or not Murray has any legitimate complaints against his previous lawyers, those complaints cannot affect the decision in his case against Walmart. I regret that Murray believes that this Court has given him insufficient time as a *pro se* litigant afflicted with medical issues. But the record I have recited shows that the Court has granted Murray many accommodations, and Murray and his doctors are unable to predict when Murray may achieve a recovery that will enable him to handle his lawsuit better. Ultimately, the Court must treat all parties fairly; defendants are entitled to timely justice, just as plaintiffs are. I cannot justify further indefinite delays. Indeed, the Civil Justice Reform Act of 1990 requires public reporting of the "names of cases that have not been terminated within three years of filing." 28 U.S.C. § 476(a)(3), a sign of Congress's view of delay.

Here is a broad outline of the facts in this case. I provide further details in the appropriate sections of the legal analysis. When the facts are properly disputed, I take Murray's version since he is the nonmoving party. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 50 (1st Cir. 2000).

Murray began working for Walmart in October 1993. Defs.' Stmt. of Material Facts (SMF) ¶ 1 (ECF No. 198-2); Pl.'s Resp. to SMF (Resp.) ¶ 1 (ECF No. 228). From February 2006 until he began a leave of absence in January 2015, Murray was a market manager, charged with overseeing eight to ten stores (the exact number changed as Walmart conducted internal realignments on occasion) in Central Maine and New Hampshire. Pl.'s Stmt. of Add'l Material Facts (SAMF) ¶ 276 (ECF No. 228). Murray was responsible for as many as 3,300 Walmart employees and more than $500 million in annual sales. Pl.'s Ans. to Interrogs. at 18 (ECF No. 198-3); Defs.' SMF ¶¶ 5-6; Pl.'s Resp. ¶¶ 5-6. As a market manager, Murray had to be on the road almost every day to travel from store to store, checking on the stores' performance and meeting with Walmart personnel. He worked seventy to eighty hours each week. Pl.'s Ans. to Interrogs. at 7. In a typical month, he spent only a couple of days in his own office. Murray Dep. at 177:7-18 (ECF No. 198-5).

Murray's neighboring market managers play important roles in his claims against the company. In the territory to the north of Murray's market, Alan Heinbaugh was the market manager. Defs.' SMF ¶¶ 25-27; Pl.'s Resp. ¶¶ 25-27. Kevin Robinson oversaw the market to the south. Defs.' SMF ¶¶ 28-30; Pl.'s Resp. ¶¶ 28-30. Each of the three markets had its own set of stores, which the

market managers ran without help from their neighboring managers. Murray Dep. at 181:13-16. The three men did not supervise one another or influence each other's salaries or annual reviews. Id. at 181:5-12. Instead, they reported to a regional manager, Paul Busby, who oversaw several markets in the region. Defs.' SMF ¶¶ 31-32; Pl.'s Resp. ¶¶ 31-32.

Murray made his first formal claim of wrongdoing in September 2013 when he submitted a complaint to Walmart's internal ethics team. See Sept. 29, 2013, email from Murray (ECF 198-10). As detailed further below, Murray claimed that he felt harassed and undermined by Heinbaugh and that Busby had failed to act when alerted to Murray's complaints. Id. at 2. Murray made largely the same claims in an eleven-page document he submitted to Walmart leadership in October 2013. Oct. 11, 2013, email from Murray (ECF 198-11).

In January 2014, Murray sent a note to a Walmart investigator alleging that Heinbaugh and Robinson created a hostile work environment through repeated offensive sexual and racial comments about others in the workplace. Message addressed to "Brandie" at 1-2 (ECF No. 198-12); see Murray Dep. at 118:12-17 (ECF No. 198-5) (explaining Brandie Patton was "a Wal-Mart global investigator"). In June 2014, Murray filed a Charge of Discrimination with the Maine Human Rights Commission and the federal Equal Employment Opportunity Commission that made the same claims. Charge of Discrimination at 3-4 (ECF 198-8). He claimed that Walmart inadequately investigated his allegations and that his supervisors and coworkers were retaliating against him by, among other things, responding more slowly to his messages and requests. Id. at 5-13.

Murray took a leave of absence for medical reasons beginning on January 20, 2015, citing several physical and mental health conditions. Request for Leave of Absence, Edwards Dep. Ex. 3 (ECF No. 198-22). Murray stated that he would return to work April 7, 2015, unless circumstances changed. Id. Unfortunately, his health apparently worsened; Murray filed requests to extend his leave of absence to May 26, 2015, then to April 5, 2016, then to October 5, 2016, then to March 22, 2017, each time including statements from his doctor attesting to his increasingly long list of conditions. Requests for Leave of Absence, Edwards Dep. Exs. 4-7 (ECF Nos. 198-23, 24, 25, 26). On April 16, 2015, Walmart told Murray that his protected medical leave had expired (he had previously used some of his protected Family and Medical Leave Act time in 2013 and 2014, Murray Dep. at 242:9-18 (ECF No. 198-5)), and that it would begin looking for a replacement to fill Murray's position. Email from David Minsky, Busby Decl. Ex. J at 3-4 (ECF No. 199-17). Murray asked to be permitted to continue as market manager, perhaps by working part-time or remotely, but Walmart said that his job was "business critical" and it needed someone working full-time who could travel to the various stores in person. Id. at 2-3; Tr. of call 1660, Albert Decl. Ex. N at 3-4 (ECF No. 200-24).[3]

In August 2015, Murray filed this lawsuit. Walmart fired Murray in October 2016. It gave two reasons: Murray's requests for ongoing leave with no reasonably anticipated return date, and Walmart's learning that Murray had

---

[3] At his deposition in June 2016, Murray stated that his health conditions still prevented him from returning to work as a market manager, and he did not know when he would be able to do so. Murray Dep. at 33:1-9 (ECF No. 198-5).

recorded more than 100 phone calls with Walmart employees related to Walmart business, without the other call participants' consent. Morris Termination Letter (ECF No. 228-4); see Murray Dep. at 138:6-25, 169:19-170:23. A Walmart official notified Murray on October 4, 2016, that he was fired, but his termination was not entered into Walmart's payroll system until January 23, 2017. McChristian Decl. ¶¶ 2-3 (ECF No. 200-7); see also Murray Dep. (second) at 6:20-22 (ECF No. 198-15).

## ANALYSIS

Murray brings retaliation, discrimination, and wage claims. He says that Walmart retaliated against him for reporting what he believed was discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; Section 1981, 42 U.S.C. § 1981; the Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4551 et seq.; and the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S.A. § 831 et seq. He claims that Walmart discriminated against him on the basis of his age and disability, violating the ADA, the MHRA, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. He also says that Walmart failed to pay him what he was owed within two weeks of his request that it do so, in violation of 26 M.R.S.A. § 626.

Walmart seeks summary judgment on all of Murray's claims.

### 1. Legal Standard

On Walmart's motion for summary judgment, I consider the undisputed facts. Where facts are disputed, I take the version most favorable to Murray as

the non-moving party.  See Santiago-Ramos v. Centennial P.R. Wireless Corp.,
217 F.3d 46, 50 (1st Cir. 2000).

Under this District's local rules, if a party does not file a written objection
to his opponent's motion, he is "deemed to have waived objection."  Local Rule
7(b).  In the context of summary judgment, that means that if the moving party's
statement of fact is supported by record citations and not properly controverted,
I take the statement as undisputed.  Local Rule 56(f).  Murray did not file a
memorandum opposing Walmart's motion for summary judgment, and he did
not respond to more than a third of Walmart's statements of fact.  See Pl.'s Resp.
¶¶ 174-274 (blank responses).  "*Pro se* litigants are not excused from complying
with the Federal Rules of Civil Procedure or the Local Rules of this district,"
Philbrick v. Maine Dept. of Health and Human Servs., 616 F. Supp. 2d 123, 126
n.3 (D. Me. 2009), and Murray has demonstrated that he is aware of these rules
by, among other things, responding to Walmart's first 173 statements of fact.
Judges reviewing summary judgment motions "must be able to rely on
procedural rules so as to avoid becoming the lawyer for the unrepresented
plaintiff or devoting an excessive portion of their time to such cases."  Clarke v.
Blais, 473 F. Supp. 2d 124, 129 (D. Me. 2007).

Even so, "in certain cases, the Court has approached summary judgment
disputes involving a *pro se* party with some leniency."  Tinkham v. Perry, 2015
WL 2092513, at *2 (D. Me. May 5, 2015).  In this case, Murray has asserted that
he was unable to comply with the rules because of his physical and mental
health limitations.  Murray Aff. ¶ 4 (ECF No. 224-1).  Therefore, despite Murray's
noncompliance with the summary judgment rules, I have not automatically

accepted Walmart's arguments and properly supported statements of fact, but rather have reviewed the broader record to satisfy myself that it supports what Walmart asserts.  See Szillery v. Career Sys. Dev. Corp., 2008 WL 2789492, at *2 (D. Me. Jul. 17, 2008) ("[E]ven if the *pro se* plaintiff fails to respond to the statements of material fact, the court is still required to inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law."); Fed. R. Civ. P. 56(e)(4) advisory committee's note to 2010 amendment ("[T]he court may seek to reassure itself by some examination of the record before granting summary judgment against a *pro se* litigant.").

I review Murray's contentions claim by claim, beginning with his retaliation allegations, followed by his disability discrimination claim, age discrimination claim, and finally his claim for unpaid wages.

## 2. Retaliation

Murray alleges illegal retaliation under both federal and state law, claiming that Walmart retaliated against him for reporting what he believed to be unlawful discrimination.  The federal and state statutes require different analyses, and I discuss them separately.

### A. Title VII

Title VII of the Civil Rights Act of 1964 makes it "unlawful for employers to retaliate against persons who complain about unlawfully discriminatory employment practices."  Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005); see 42 U.S.C. § 2000e–3(a).  At the summary judgment stage, claims of retaliation under Title VII are evaluated using the McDonnell Douglas burden-

shifting framework.  Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  The framework has three steps.  First, the plaintiff must "make out a '*prima facie* case' which requires only 'the production of admissible evidence, which, if uncontradicted, would justify a legal conclusion of [retaliation].'" Theriault, 890 F.3d at 350 (quoting Sanchez v. P.R. Oil Co., 37 F.3d 712, 719 (1st Cir. 1994)).  If the plaintiff successfully demonstrates this *prima facie* case, the burden shifts to the defendant, who "must articulate a legitimate, non-retaliatory reason for its employment decision."  Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006) (quoting Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004)).  Finally, if the defendant meets its burden, "the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus."  Id.[4]

---

[4] Walmart argues that some of Murray's allegations are time-barred under both Title VII and the Maine Human Rights Act, Mot. for Summ. J. at 35-37 (ECF No. 198-1), because they occurred outside the 300-day period leading up to Murray's charge of discrimination with the Maine Human Rights Commission and the Equal Employment Opportunity Commission.  See 42 U.S.C. § 2000e-5(e)(1) (requiring charge under Title VII be filed "within three hundred days after the alleged unlawful employment practice occurred"); 5 M.R.S.A. § 4611 ("[A] complaint must be filed with the commission not more than 300 days after the alleged act of unlawful discrimination."); Ayala v. Shinseki, 780 F.3d 52, 56 (1st Cir. 2015) ("If a claimant fails to [file an administrative complaint within the 300-day period], discrete discriminatory acts will be time-barred, and thus not actionable, even if they are related to acts alleged in timely filed charges.").  Thus, Walmart contends that any acts that took place before August 6, 2013—300 days before Murray filed his administrative complaint on June 2, 2014, see Charge of Discrimination (ECF No. 198-8)—cannot support Murray's claims.  I conclude that Murray's retaliation claim is not time-barred. As discussed in text, the adverse employment actions arguably supporting his claim are his 2014 performance review, which occurred during the 300-day period, and his termination, which occurred after he filed the administrative complaint.

### i.   Step One: Prima Facie Case

At step one, then, the question is whether Murray can point to sufficient evidence to make out a claim for retaliation.  "A retaliation claim requires a showing that (1) the plaintiff engaged in protected conduct; (2) [he] was subjected to an adverse employment action; and (3) there was a causal connection between the first and second elements."  Id. at 94.  In his *prima facie* case, Murray can successfully show that he engaged in protected conduct and was subjected to an adverse employment action.  However, he has not produced evidence showing a causal connection between the two.  Without that causal connection, Murray's Title VII claim fails at the *prima facie* stage.

### (a) Protected Conduct

Walmart does not seem to dispute that Murray engaged in protected conduct.  Complaining to supervisors about perceived discrimination counts as protected conduct, Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003), and so does filing a formal complaint, Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).

The record demonstrates that Murray engaged in protected conduct on at least three occasions.

In a January 2014 message addressed to a Walmart internal investigator, Murray alleged that Heinbaugh, Robinson, and Busby were engaged in "unlawfully discriminatory actions."  Message Addressed to "Brandie" at 1-2 (ECF No. 198-12); see Murray Dep. at 118:12-17 (ECF No. 198-5) (explaining Brandie Patton was "a Wal-Mart global investigator").  He alleged that Heinbaugh and Robinson created a hostile work environment by repeatedly making offensive

sexual comments about women in the workplace and, in Robinson's case, also making racially offensive comments about President Obama and other African Americans.[5]  Murray also claimed that Busby said Murray was "too old to be shoveling snow," called Murray "Bill Clinton and Slick Willie,"[6] and discussed, in front of other people, what Murray described as an "ADA accommodation for severe Sleep Apnea"—a private hotel room the company provided him during a business trip so that he would not have to share a room with another employee. Message Addressed to "Brandie" at 3 (ECF No. 198-12).  For a complaint to constitute protected activity, any event it described "need not be a Title VII violation so long as [the complainant] had a reasonable belief that it was." Benoit, 331 F.3d at 175.  Murray made clear in the message that he believed the behavior he described constituted unlawful discrimination based on race, sex, age, and disability.  Message Addressed to "Brandie" at 1, 3 (ECF No. 198-12). For purposes of this summary judgment decision, I will assume that his belief was reasonable and this message was therefore a protected activity.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 50 (1st Cir. 2000) (I view the record in the light most favorable to the nonmovant at the summary judgment stage).

---

[5] Heinbaugh and Robinson, who are not parties to this lawsuit, denied in their depositions that they made such comments.

[6] It is not clear whether Murray sees this name calling as discriminatory in some way or as retaliatory.  It does not appear to be discriminatory against Murray.  And it does not constitute the kind of adverse employment action required to support a retaliation claim—the standards for which are set out below—because it is not so severe that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

In June 2014, Murray filed a Charge of Discrimination with the Maine Human Rights Commission and the Equal Employment Opportunity Commission in which he made the same allegations regarding Heinbaugh, Robinson and Busby.  Charge of Discrimination (ECF No. 198-8).

Then in August 2015, Murray filed this lawsuit.  See Lewis v. Am. Sugar Refining, Inc., 325 F. Supp. 3d 321, 357 (S.D.N.Y. 2018) ("Plaintiff participated in a protected activity by . . . filing the present lawsuit.").

The message to the Walmart investigator, the formal Charge of Discrimination, and the filing of this lawsuit all constitute protected conduct, since Murray was reporting activities that he believed violated anti-discrimination and retaliation laws.[7]  See Benoit, 331 F.3d at 175.

---

[7] Murray made other complaints claiming that he felt harassed, bullied, and threatened by his colleagues, but these do not constitute protected conduct under Title VII because he did not indicate that he believed any of those behaviors were discriminatory against a protected class; in other words, there is no evidence from the complaints that he believed any of the acts he described violated Title VII.  Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003) (for an employee's complaint to constitute protected conduct, he must have at least "a reasonable belief" that the activity he opposes violated Title VII).

In one of these complaints, submitted to the Walmart Ethics Team in September 2013, Murray stated he felt threatened by Busby because, among other things, Busby had not followed up on Murray's concerns about harassment he felt from Heinbaugh, who made unannounced visits to Murray's stores, took pictures inside, and told employees that the stores would be assigned to Heinbaugh in Walmart's next realignment.  Murray Compl. to Ethics Team at 2-3 (ECF No. 198-10).  Murray also complained that Julie Murphy, a Walmart executive who supervised Busby, visited two of Murray's stores unannounced while he was on vacation, identified many problems and blamed them on Murray's leadership, and then did not offer Murray an opportunity to explain the reasons for some of those problems.  Id. at 2.

In October 2013, Murray sent Walmart leadership an eleven-page description of the harassment he believed he was experiencing.  Oct. 11, 2013, email from Murray (ECF 198-11).  It described the same events that were in his Ethics Team complaint, plus others, but again did not allege that any of the behavior discriminated against any protected class.  Instead, the events Murray described amounted to the kind of "petty slights or minor annoyances that often take place at work" and that are nonactionable.  Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

As discussed in text, Murray filed a Charge of Discrimination with the Maine Human Rights Commission in June 2014 in which he said that Heinbaugh and Robinson created a hostile work environment with a series of racist and sexist comments.  The Charge claimed that Murray reported those concerns to Walmart in his September and October 2013 complaints.  Charge of Discrimination ¶ 8 (ECF No. 198-8).  In fact, those 2013 complaints made no mention

### (b) Adverse Employment Action

There is no dispute that Murray received at least one adverse employment action: his termination on October 4, 2016. To be an adverse employment action, the event must have been significant enough that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). "This is an objective test and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. Examples of adverse employment actions in the retaliation context include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010) (internal quotation marks and citations omitted). Murray's termination qualifies as an adverse employment action.

Murray claims that his 2014 performance evaluation was also an adverse action. See Second Am. Compl. ¶ 38 (ECF No. 159). That evaluation gave him the same overall rating as he received the previous year. Performance Eval. Compendium at 20 (summary of 2014 evaluation), 26-27 (summary of 2013 evaluation) (ECF No. 198-14). Murray's salary, benefits, and responsibilities were not affected, and he was not disciplined. Busby Decl. ¶¶ 5, 16 (ECF No. 199-7); see Defs.' SMF ¶ 110; Pl.'s Resp. ¶ 110. The evaluation did not constitute

---

of racist or sexist comments. See Murray Compl. to Ethics Team (ECF No. 198-10); Oct. 11, 2013, email from Murray (ECF 198-11).

the kind of adverse action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68; see also Morales-Vallellanes, 605 F.3d at 36.

Murray attempts to overcome this assessment with an argument that his 2014 evaluation should have been higher than 2013's and, if it had been, his salary would have increased.[8] See Pl.'s Resp. ¶ 110. This argument is not supported by the record. The overall evaluation was made up of many individual "competency areas," each of which was scored on a five-level scale. See Performance Eval. Compendium at 1, 20 (ECF No. 198-14). Murray's "competency area" ratings were all the same in 2014 as in 2013 except for the "results leadership: execution and results" category, in which Murray was downgraded two levels. Defs.' SMF ¶¶ 105-06; Pl.'s Resp. ¶¶ 105-06. In a self-evaluation, Murray had downgraded himself in the same category, although only by one level. Defs.' SMF ¶ 107; Pl.'s Resp. ¶ 107. In another category, "diversity and inclusion," Murray claims that he should have received a higher rating in 2014 because he followed all the instructions he had received the year before regarding how to boost his performance in that area. Pl.'s Resp. ¶ 114. He contends that the higher "diversity and inclusion" rating, combined with a smaller downgrade in the "results leadership" category, would have increased his overall rating and thus increased his pay. Pl.'s Resp. ¶¶ 104, 110, 114. But

---

[8] Murray also claims that Busby retaliated against him by writing in the 2014 performance evaluation that Murray was in the 0.00 percentile for market managers. Second Am. Compl. ¶ 38 (ECF No. 159). Busby testified at deposition that this was a typo that occurred on multiple employees' evaluations. Busby Dep. at 267:25-268:14 (ECF No. 198-20). Murray cites no evidence to the contrary. And there is no evidence that this erroneous percentile disadvantaged Murray in any way.

Murray does not cite evidence showing that he did all that was required for a higher "diversity and inclusion" rating, or that those two changes would have resulted in a higher salary.

Murray additionally claims that Walmart "constructively discharged" him in April 2015. Second Am. Compl. ¶ 52 (ECF No. 159). This allegation appears to refer to Walmart's decision to fill Murray's market manager position with someone else after he had exhausted his protected medical leave time and remained on unpaid leave. See Email from David Minsky, Busby Decl. Ex. J at 3-4 (ECF No. 199-17); Tr. of call 1660, Albert Decl. Ex. N at 3-4 (ECF No. 200-24). Under Supreme Court caselaw, however, Murray was not constructively discharged because he did not resign from Walmart but remained an employee. Green v. Brennan, 136 S. Ct. 1769, 1777 (2016) (in a claim for constructive discharge, "[a] plaintiff must . . . show that he actually resigned").

A number of other events that Murray cites similarly do not rise to the level of adverse employment action.[9] The Supreme Court has made clear that adverse action requires "*material* adversity," and it distinguishes "significant from trivial harms." Burlington Northern, 548 U.S. at 68 (emphasis in original). "Minor disruptions in the workplace, including petty slights, minor annoyances, and simple lack of good manners, fail to qualify" as adverse employment actions. Morales-Vallellanes, 605 F.3d at 36. I detail these other events here.

**Market Realignment.** Murray claims that a "market realignment" in early 2014 was retaliation against him. Second Am. Compl. ¶¶ 36-37 (ECF No. 159).

---

[9] Some of these events are outside the 300-day period permitted by Title VII and the Maine Human Rights Act and are therefore time-barred. See note 4, supra.

Walmart occasionally realigned the boundaries of its internal markets, changing which stores were supervised by which market manager. In 2014, it eliminated a market that included stores in New Hampshire and Vermont, distributed those stores into other markets, and made various other changes. Busby Decl. ¶¶ 18-19 (ECF No. 199-7). Murray's market gained two stores in New Hampshire and lost two in Maine. Id. ¶ 18. He claims this realignment adversely affected his market and benefited his neighboring market managers, Heinbaugh and Robinson, but he neither explains nor cites any evidence showing why or how this alignment adversely affected him. See Pl.'s Resp. ¶ 43. For all the record shows, the addition of these two stores might have been a positive for Murray, offering him opportunities he did not have before; there is simply no evidence either way. The record does not show that this was an adverse action.

**Unannounced Visit.** In another act of alleged retaliation, Murray said that Julie Murphy, a Walmart executive who supervised Busby, visited at least one of Murray's stores unannounced on September 22, 2013, while he was on vacation. Pl.'s SAMF ¶ 287. Murphy identified many problems with the store and appeared to blame them on Murray's leadership. See Email from Murphy, Busby Decl. Ex. B (ECF No. 199-9). Murray claims Murphy did not offer him an opportunity to explain, or attempt to understand the reasons for, some of those problems. Pl.'s SAMF ¶ 287. But while Murray may have been unhappy with the visit, the evidence does not show that the visit led to any ill effects in the long run. On the same day as Murphy's visit, Murray submitted a plan to address the problems she identified and "assur[ed]" her that he would "keep the focus" on the problems. Busby Decl. Ex. E (ECF No. 199-12). Murphy thanked him for

following up.  Id.  Murray was not disciplined, and his overall rating in his next evaluation (the 2014 evaluation discussed above) did not change.  Murray does not point to any evidence of negative effects resulting from Murphy's visit.  See Paquin v. MBNA Mktg. Sys., Inc., 233 F. Supp. 2d 58, 67 (D. Me. 2002) ("[N]ot everything that makes an employee unhappy constitutes an actionable adverse action.").

**Vendor Payment.**  Murray also cites an instance when Walmart delayed paying a vendor.  In the spring of 2014, one of Murray's stores was being remodeled, and Murray needed to hire temporary staff to help.  The staffing agency he used had not been pre-approved by Walmart—a requirement before Walmart would pay the vendor.  Busby Decl. ¶¶ 39-40 (ECF No. 199-7).  Murray contends that Busby had authority to approve the vendor quickly but Walmart instead sent the request through a slower corporate channel in retaliation for Murray's complaints.  Pl.'s SAMF ¶ 296.  Murray says the delayed vendor payment hurt his professional reputation and caused him a stress reaction.  Pl.'s Resp. ¶ 166.  The vendor was eventually approved and paid, but several weeks later than it might have been had the process moved faster.  Defs.' SMF ¶ 164; Pl.'s Resp. ¶ 164.  This delay did not affect Murray's performance evaluations or his market's financial metrics.  Busby Decl. ¶ 42; see also Defs.' SMF ¶ 166; Pl.'s Resp. ¶ 166.  And Murray does not support his claim about his reputational damage and stress with any evidence.  See Pl.'s Resp. ¶ 166.  Even if they were supported by evidence, those effects are closer to "petty slights or minor annoyances" than the kind of "material adversity" that constitutes an adverse employment action.  Burlington Northern, 548 U.S. at 68.

**Discrimination Investigation.** Murray says that Walmart retaliated by dragging its feet in investigating his discrimination complaint, noting that he filed his initial internal complaint in September 2013 but the investigation did not begin until December 2013 or January 2014. See Pl.'s Ans. to Interrogs. at 18 (ECF No. 198-3). He cites no evidence to show that the delay caused him any actual harm.[10]

**Markdown Investigation.** Murray claims that he faced retaliation in the form of an internal investigation into the markdown practices of the store in Waterville, Maine. Murray Dep. at 200:25-201:8 (ECF No. 198-5). This store had been in Murray's market until it was moved to Heinbaugh's in the 2014 realignment. Upon taking over management of the store, Heinbaugh raised concerns that inventory that should have been marked down (because it was unsellable for various reasons) had not been. Heinbaugh Dep. at 90:18-91:11 (ECF No. 199-4). Walmart initiated an investigation of the store's markdown practices, and Murray was interviewed as part of the inquiry. Murray claims that Walmart knew at the time of this interview that Murray was represented by counsel but did not inform him his attorney could be present. Pl.'s Resp. ¶ 138. He does not cite record evidence for this statement. Regardless, Murray admitted at his deposition that he was never disciplined in connection with the markdown investigation and no one told him he did anything wrong. Murray Dep. at 201:9-

---

[10] Walmart claims that its Global Investigation office did not begin an inquiry sooner because Murray's initial complaints did not make clear he was raising concerns about harassment and discrimination. Defs.' SMF ¶ 237. This explanation accords with the record, which demonstrates that Murray's September and October 2013 complaints said nothing about discrimination on the basis of any protected class; he did not allege race or sex discrimination until his January 2014 message. See note 7, supra.

14 (ECF No. 198-5). The record does not show that he suffered any negative effects.

**Deposited Funds.** Murray claims he suffered continued retaliation in January 2017 when Walmart deposited and then withdrew $3,776.09 from Murray's bank account. Pl. Aff. ¶ 5 (ECF No. 224-1). Walmart's senior director of payroll services stated that the company had paid Murray this amount as his final paycheck (although it later determined he was not entitled to this money because he had been on unpaid leave, as explained further in the section below on Murray's claim for unpaid wages). McChristian Decl. ¶¶ 7-8 (ECF No. 200-7). The "amount was direct deposited automatically" into Murray's account, just as his wages had been before he began his leave. Id. ¶ 8. But then, while the money was "in transit," Walmart said it "reversed the direct deposit" and paid the $3,776.09 to Murray by check instead. Id. ¶¶ 9, 14. Murray acknowledged receiving the check. Pl.'s Resp. to Defs.' Request for Admissions at 2 (ECF No. 226-5). It is not clear how Murray believes he was disadvantaged by these events, and the evidence does not show that Walmart deprived Murray of anything of value.

**Parking Lot Death.** Murray claims that Walmart retaliated against him "for reporting violations of the law" after a woman was hit and killed by a truck in the parking lot of one of Murray's stores in 2014. Murray Aff. ¶ 7 (ECF No. 224-1). Neither the woman nor the truck was associated with Walmart, and Murray was not at the store when the woman was killed. Richard Decl. ¶¶ 11-12 (ECF

No. 200). Murray does not explain how Walmart retaliated against him regarding this incident, and there is no evidence in the record that it did.[11]

While each of these allegations, assuming they are true, may "indicate that the plaintiff's workplace was not an idyllic retreat," <u>Martin v. Inhabitants of City of Biddeford</u>, 261 F. Supp. 2d 34, 38 (D. Me. 2003), they are not so severe that they "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," <u>Burlington Northern</u>, 548 U.S. at 68. Individually or collectively, they are not adverse employment actions that would support a claim of retaliation.

That leaves three instances of protected conduct—the internal report Murray filed in January 2014, his formal Charge of Discrimination in June 2014, and this lawsuit in August 2015—and one adverse employment action: Murray's termination in October 2016.

### *(c) Causation*

To show causation in a Title VII retaliation case, a plaintiff-employee must establish that his protected conduct was a "but-for" cause of the adverse employment action. <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 362 (2013). In this case, that means Murray must point to evidence that he would not have been fired but for his protected conduct. Showing only that his protected conduct was a "motivating" factor—possibly one of several factors—is not enough. <u>Id</u>. at 360; <u>see also</u> <u>Ponte v. Steelcase Inc</u>., 741 F.3d 310, 321 (1st

---

[11] There is also no evidence that Murray reported anything illegal. His affidavit cites two documents—a note to Busby and a transcript of a call between the two—that only show Murray doubted statements from the police that the woman was not intoxicated. <u>See</u> Murray Aff. ¶ 7 (ECF No. 224-1); Note to Busby (ECF No. 226-3); Tr. of call 1665 (ECF No. 226-4).

Cir. 2014) (recognizing the Supreme Court "rejected the less stringent standard that the plaintiff must show only that retaliation was a 'motivating' factor").

Sometimes "[v]ery close temporal proximity between protected activity and an adverse employment action" can support causation.  Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012) (finding a three-month gap between the plaintiff's EEOC complaint and his adverse employment action "close enough to suggest causation, especially given the inferences we must draw in [the plaintiff's] favor" at the summary judgment stage).  Here, however, Murray was fired 33 months after he first reported his concerns about discrimination and a hostile work environment, and more than a year after he filed this lawsuit.  That timing does not support causation based on temporal proximity.

Murray could also satisfy his causation burden by pointing to other kinds of evidence, direct or circumstantial, that Walmart fired him because of his protected activities.  But the record provides no direct evidence—no emails, for example, between Walmart executives saying they planned to get rid of Murray because of his complaints.  There is also no circumstantial evidence—no indications that Walmart officials were angered or irritated, for example, by Murray's reports.  To the contrary, they appear to have taken the allegations seriously, instituting an investigation into Murray's claims that involved interviewing witnesses and reviewing emails and text messages.  Patton Dep. at 49:18-50:2 (ECF No. 199).

I conclude that Murray has failed to make a *prima facie* case that his protected conduct was a "but-for" cause of his termination. As a result, Murray is unable to maintain his claim under Title VII.

### ii. Step Two: Legitimate Nondiscriminatory Reasons

Even if Murray had made a *prima facie* case, Walmart has cited multiple nondiscriminatory reasons for its termination of Murray. Walmart's stated reasons for firing Murray were his surreptitious recordings of phone conversations with colleagues and his requests for ongoing leave with no reasonably anticipated return date. Termination Letter From Morris (ECF No. 228-4). These are two legitimate, non-discriminatory reasons for Murray's termination. Walmart satisfies its burden at step two. <u>See Valentin-Almeyda v. Mun. of Aguadilla</u>, 447 F.3d 85, 95 (1st Cir. 2006).

### iii. Step Three: Pretext

If I reached this stage, Murray would have to "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." <u>Id</u>. Murray's filings do not expressly state a pretext argument. However, he is a *pro se* party, and while I must "avoid becoming the lawyer for the unrepresented plaintiff," <u>Clarke v. Blais</u>, 473 F. Supp. 2d 124, 129 (D. Me. 2007), I may still "seek to reassure [my]self by some examination of the record before granting summary judgment against a *pro se* litigant," Fed. R. Civ. P. 56(e)(4) advisory committee's note to 2010 amendment. This flexibility coincides with my general obligation at step three of the <u>McDonnell Douglas</u> framework to "look at the total package of proof offered by the plaintiff," <u>Benoit v. Tech. Mfg. Corp</u>., 331 F.3d 166, 174 (1st Cir. 2003),

"having in mind that courts should exercise particular caution before granting summary judgment for employers on such issues as pretext," <u>Santiago-Ramos v. Centennial P.R. Wireless Corp</u>., 217 F.3d 46, 54 (1st Cir. 2000).  After review, I find that the evidence cannot support a conclusion that Walmart's reasons are pretextual.

There are several ways to demonstrate pretext.  "One method is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker."  <u>Id</u>. at 55.  Phil Morris, the Walmart human resources executive who signed the letter informing Murray that he was fired, offered uncontradicted deposition testimony that he made the ultimate termination decision.  Morris Dep. at 6:25-7:1 (ECF No. 199-6).  Murray offers no evidence that Morris made any comments or took any actions indicating discriminatory or retaliatory intentions.  Murray also offers no evidence to show that the Walmart employees he accuses of discrimination and retaliation influenced Morris's decision.

"Another method of establishing pretext is to show that [the defendant's] nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action."  <u>Santiago-Ramos</u>, 217 F.3d at 56.  The two reasons Walmart now offers for firing Murray—his surreptitious recordings and indefinite leave—are the same reasons Morris gave when he told Murray he was fired.  Termination Letter From Morris (ECF No. 228-4).  Walmart's story has stayed the same.

Finally, Murray could "also establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos, 217 F.3d at 56 (internal quotation marks omitted). The summary judgment record demonstrates no such problems with Walmart's explanation.

Murray admitted to recording phone calls with his colleagues, often during internal business discussions, more than 100 times. Murray Dep. at 138:6-25 (ECF No. 198-5). Walmart claims those recordings violated its policies against "record[ing] the company's confidential or proprietary data" or recording phone conversations with employees without their consent. Defs.' SMF ¶¶ 242-45.

Walmart also states that Murray's multiple extensions of his leave of absence amounted to a request for indefinite leave and were unreasonable. Mot. for Summ. J. at 20 (ECF No. 198-1). After initially requesting a leave of absence in January 2015, Murray extended the leave four times, without offering any concrete reason to believe he would likely be able to return to work at a definite time. In his deposition for this case, in June 2016, Murray testified that he did not know when he would be capable of returning to work at Walmart and that, at that time, he did not believe he was able to work in any occupation. Murray Dep. at 33:1-9, 39:2-5 (ECF No. 198-5). His doctor testified that the date of return listed in Murray's leave request was not based on any "clear diagnosis" and was instead rooted in "hope spring[ing] eternal." Edwards Dep. at 113:15-21 (ECF No. 198-21). Walmart thus points to his continuing absence as a second reason for firing Murray. Neither of Walmart's two reasons appears to be pretextual.

In conclusion, Murray has not satisfied his burden under the McDonnell Douglas framework. At step one, he has not shown causation—the evidence does not support a conclusion that his termination was caused by his protected activities. But even if he could show causation, Walmart satisfies step two and Murray fails at step three because he is unable to show that Walmart's explanations for firing him were merely pretextual. Therefore, Walmart is entitled to summary judgment on Murray's federal (Title VII) retaliation claim.

### B. Maine Whistleblowers' Protection Act

Murray claims retaliation in violation of two state laws: the Whistleblowers' Protection Act (MWPA) and the Maine Human Rights Act (MHRA). I analyze these laws together, since "the MWPA itself provides no private right of action," leaving complainants to "file a civil action under the MHRA" instead. Tripp v. Cole, 425 F.3d 5, 9 n.4 (1st Cir. 2005); see also Osher v. Univ. of Maine Sys., 703 F. Supp. 2d 51, 64 n.13 (D. Me. 2010) ("Although the MWPA provides no private right of action, plaintiffs may file a civil action under the MHRA."); Sullivan v. St. Joseph's Rehab. and Residence, 143 A.3d 1283, 1285 n.2 (Me. 2016) ("The Maine Human Rights Act prohibits discrimination in violation of the Whistleblowers' Protection Act, and provides employees with an avenue through which to obtain damages as a result of retaliation under the WPA.").

For an alleged whistleblower to prevail on a claim of retaliation, "the plaintiff must demonstrate that '(1) [he] engaged in activity protected by the WPA; (2) [he] experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.'" Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 349 (1st Cir. 2018) (quoting

Walsh v. Town of Millinocket, 28 A.3d 610, 616 (Me. 2011)).  Although the Law Court has held that the McDonnell Douglas framework does not apply to retaliation claims under the Maine Whistleblowers' Protection Act, Brady v. Cumberland Cnty., 126 A.3d 1145, 1158 (Me. 2015), the conclusions I reached above apply equally to Murray's state-law claims.  Specifically, Murray engaged in protected activity when he filed an internal report in January 2014, a Charge of Discrimination in June 2014, and this lawsuit in August 2015, and his termination was an adverse employment action.  But the facts in the record do not show that there was a causal connection between the activity and the adverse action.

"To demonstrate a causal link sufficient to defeat a summary judgment motion" on a retaliation claim under the MWPA, Murray must make a sufficient evidentiary showing that his protected activity "was a substantial, even though perhaps not the only, factor motivating [his] dismissal." Theriault, 890 F.3d at 349; see also Brady, 126 A.3d at 1154 (requiring the plaintiff to show "the adverse employment action was motivated at least in part by retaliatory intent").  Although this is a more permissive standard than the "but-for" causation required under Title VII, the result is the same.  Murray was fired more than a year after his last protected activity.  He has provided no direct or circumstantial evidence of retaliatory intent.  Murray has failed to show that his protected activity "was a substantial . . . factor motivating [his] dismissal." Theriault, 890 F.3d at 349.  Walmart is entitled to summary judgment on Murray's state-law retaliation claims.

### *3. Disability Discrimination*

Murray asserts claims for disability discrimination under the Americans With Disabilities Act (ADA) and the Maine Human Rights Act.[12]  Second Am. Compl. ¶ 60 (ECF No. 159).  While the ADA analysis involves the <u>McDonnell Douglas</u> burden-shifting framework, <u>Tobin v. Liberty Mut. Ins. Co</u>., 433 F.3d 100, 104 (1st Cir. 2005), it is unclear whether the MHRA requires the same framework, <u>see</u> <u>Bachelder v. MjjM Enter., Inc</u>., 2019 WL 921443, at *14 (D. Me. Feb. 25, 2019); <u>see also</u> <u>Brady</u>, 126 A.3d at 1158 (abandoning <u>McDonnell Douglas</u> framework in MHRA *retaliation* case).  Ultimately, the distinction is irrelevant in this case because Murray is unable to prevail either way.[13]

To carry his initial burden at step one of the ADA burden-shifting, Murray must establish "that (1) he suffers from a disability or handicap, as defined by the ADA . . ., that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and that (3) [the defendant] took an adverse employment action against him because of, in whole or in part, his protected disability." <u>Tobin</u>, 433 F.3d at 104.  Those are essentially the same elements required of him to defeat summary judgment on his MHRA

---

[12] Murray also brought a claim for disability discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Second Am. Compl. ¶ 60 (ECF No. 159).  Section 504 "prohibits discrimination against any qualified handicapped individual in 'any program or activity receiving Federal financial assistance.'"  <u>U.S. v. Hersom</u>, 588 F.3d 60, 65 (1st Cir. 2009) (quoting 29 U.S.C. § 794).  Murray has presented no evidence that Walmart receives the requisite federal financing.  Regardless, even if the Rehabilitation Act applied to Walmart, my analysis under that statute would be the same as under the ADA.  See <u>Pollack v. Reg'l Sch. Unit 75</u>, 886 F.3d 75, 80 n.2 (1st Cir. 2018) ("Because courts have interpreted the relevant parts of the two statutes consistently, and because plaintiffs make no argument that any difference between the two statutes is relevant to this appeal, we focus our analysis on the ADA.").

[13] Since I conclude that the evidence does not show Murray suffered discrimination under the MHRA, his claims that Walmart aided and abetted unlawful discrimination and interfered with his exercise and enjoyment of the rights protected by the MHRA, <u>see</u> Second Am. Compl. ¶ 60 (ECF No. 159), also fail.

claim.  Whitney v. Wal-Mart Stores, Inc., 895 A.2d 309, 312 (Me. 2006) (superseded by statute on other grounds) ("An employee plaintiff pursuing a claim for disability discrimination must establish that first, he suffers from a disability; second, he is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, he was adversely treated by the employer based in whole or in part on his disability.").

It is uncontested that Murray suffers from a disability, as his doctors repeatedly attested in Murray's requests for leaves of absence from Walmart and motions for time extensions in this Court.  But Murray fails to satisfy the second element.  He testified at his deposition that he did not believe he was well enough to return to work as a market manager—or any other job in any occupation, Murray Dep. at 39:2-5 (ECF No. 198-5)—and he did not know when he would be able to.  Id. at 33:1-9.  At the time of his deposition, he said he was not driving (necessary, as part of his job, to visit the stores for which he was responsible) because of safety concerns related to his medical conditions.  Id. at 44:3-45:14. Murray's last request to extend his leave said that he would return to work on March 23, 2017, but his doctor testified that that date was not based on any "clear diagnosis" and was instead rooted in "hope spring[ing] eternal."  Edwards Dep. at 113:15-21 (ECF No. 198-21).  While Murray asked to work part-time or from home, which he described as "reasonable accommodations," Email from Murray, Busby Decl. Ex. J at 2-3 (ECF No. 199-17), Walmart responded without contradiction that a person cannot do the market manager job effectively without

working full-time and traveling to the various stores in the market, Tr. of call 1660, Albert Decl. Ex. N at 3-4 (ECF No. 200-24); Mot. at 34-35.

Because the evidence does not show that Murray was "able to perform the essential functions of his job, either with or without reasonable accommodation," Tobin, 433 F.3d at 104, Walmart is entitled to summary judgment on Murray's disability discrimination claims.[14]

### 4. Age Discrimination

Murray's complaint does not explicitly allege age discrimination, see Second Am. Compl. ¶ 60 (ECF No. 159), but as a whole it suggests he intends to bring such a claim, id. ¶ 45; see also id. ¶ 59 (repeating the allegations in all proceeding paragraphs); Tinkham v. Perry, 2015 WL 2092513, at *2 (D. Me. May 5, 2015) (the court may approach "summary judgment disputes involving a *pro se* party with some leniency"). I will presume that, like his disability discrimination claim, his age discrimination claim is based on the MHRA.[15] The

---

[14] Although I need not reach the question whether Walmart treated Murray adversely "based in whole or in part on his disability," Whitney, 895 A.2d at 312, I note that Murray also appears to argue that Busby exhibited discriminatory animus regarding Murray's sleep apnea. In one instance, Murray says that Busby discussed, in front of other people, what Murray describes as an "ADA accommodation for severe Sleep Apnea"—a hotel room the company obtained for him during a business trip so that he would not have to share a room with another employee. Pl.'s Ans. to Interrogs. at 27 (ECF No. 198-3). In another, after Murray joined a morning conference call late and announced himself, Busby replied, "Oh okay then, I thought you were asleep." Tr. of call 1657 at 3 (ECF No. 200-23). The night before, Murray had told Busby that he was getting home late from work and would start the next morning "a little later to get some rest." Email from Murray (ECF No. 198-13). Neither of these events shows discriminatory animus. The hotel room discussion appears to be an isolated incident, and there is nothing in the record to show what Busby said or to whom he said it. Busby himself has sleep apnea. Busby Dep. at 309:18-25 (ECF No. 198-20). Busby's comment on the conference call was clearly responding to Murray's previous message.

[15] Walmart assumes that Murray is basing his claim on the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. See Mot. at 2. But unlike the MHRA—which Murray cites repeatedly in his second amended complaint and which protects against discrimination based on age as well as disability, 5 M.R.S.A. § 4571—nowhere does he mention the ADEA.

record does not contain evidence to support a claim that Murray suffered age discrimination.

Murray points to two instances of alleged age discrimination. First, he cites a 2010 email chain in which Murray wrote that he would be late to work because he was clearing snow, and Busby replied "Your [sic] getting too old to shovel snow; don't be cheap, hire a snow plow man !!! :-)" Second Am. Compl. ¶ 45 (ECF No. 159); Email from Busby, Murray Dep. Ex. 12 (ECF No. 198-9). This statement cannot support Murray's discrimination claim because it occurred more than 300 days before he filed his complaint with the Maine Human Rights Commission and the Equal Employment Opportunity Commission on June 2, 2014. See 42 U.S.C. § 2000e-5(e)(1); 5 M.R.S.A. § 4611; Ayala v. Shinseki, 780 F.3d 52, 56 (1st Cir. 2015) ("If a claimant fails to [file an administrative complaint within the 300-day period], discrete discriminatory acts will be time-barred, and thus not actionable, even if they are related to acts alleged in timely filed charges."). Even if this email were not time-barred, it does not show discrimination. The three exclamation points, followed by a smiley face, show that Busby (who is older than Murray, Defs.' SMF ¶ 34; Pl.'s Resp. ¶ 34) was joking.

Second, Murray cites a comment Busby made to him in August 2014 regarding older cashiers in Murray's stores. Busby told him to place the "college kids," who "were twice as productive as those cashiers that had tenure," on the speedy checkout lanes and to place the cashiers who have "been around 20 years, 25 years" on the non-speedy checkout lanes. Tr. of call 1621 (ECF No. 200-22). Murray admits that Busby's comment did not reference *Murray's* age.

Murray Dep. at 110:4-8.  It does not support a claim that Walmart discriminated against Murray based on his age.[16]

### 5.  *Other Discrimination*

Murray asserts a claim under 42 U.S.C. § 1981, Second Am. Compl. ¶ 60 (ECF No. 159), a statute that "prohibits both public and private racial discrimination in certain specified activities."  Garrett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002); see 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right [in a variety of situations] . . . as is enjoyed by white citizens.").  "To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute."  Garrett, 295 F.3d at 98.  Murray is not a member of a racial minority.  Murray Dep. at 85:1-6 (ECF No. 198-5).  He also does not allege that Walmart discriminated against him based on his race.  Id. at 86:11-21.  His claim under 42 U.S.C. § 1981 therefore fails.

### 6.  *Unpaid Wages*

In addition to his retaliation and discrimination claims, Murray makes a claim under 26 M.R.S.A. § 626 for unpaid salary and earned vacation time. Second Am. Compl. ¶ 60B (ECF No. 159).  Murray's complaint says that he demanded those payments on June 16, 2017, and Walmart failed to make them

---

[16] Busby's comment does not appear to discriminate against *anyone* based on age, since the cashiers with "tenure" suffered no ill effects; they were simply moved to different registers.

within the period required by statute.  Id.[17]  But nowhere does Murray allege what Walmart owed him.  His complaint claims only that Walmart "failed to pay Murray for his unpaid salary and earned paid vacation time."  Id.

Walmart contends that it owes nothing to Murray, and that it actually overpaid him.  Although Murray was fired October 4, 2016, Walmart failed to enter his termination into its payroll and benefits system until January 23, 2017.  McChristian Decl. ¶ 3 (ECF No. 200-7).  That delay caused Walmart to compute Murray's paid time off incorrectly, calculating that he had accrued additional paid time off in the period after October 4—when, in fact, he was no longer working at the company.  Id. at ¶ 5.  It paid Murray for that unused (and unearned) paid time off.  Id.  Additionally, when Walmart terminated Murray from its system, the fact that Murray had been on unpaid leave when he was fired created complications; because of the way the system was set up, it required that he be "returned to work" before he could be terminated.  Id. at ¶ 7.  The administrator entered him as "returned to work," but then delayed 11 days before terminating him, causing the system to generate a regular earnings payment of $6,448.65 for Murray.  Id.  In total, Walmart says, Murray received $13,892.90—the net amount of the paid time off and wages—to which he was not entitled.  Id. at ¶ 14.  Walmart does not seek recovery of that money.

---

[17] At the time Murray was fired, 26 M.R.S.A. § 626 required an employee to make a demand of his employer for unpaid wages, and it gave the employer two weeks from the demand in order to pay them.  26 M.R.S.A. § 626 (1995).  The statute was revised effective November 1, 2017, to eliminate the demand requirement.  Under the revised statute, the employer must pay any money owed by the employee's next established payday, regardless of whether the employee made a demand.  26 M.R.S.A. § 626 (2017).

Since Murray has filed no opposition to Walmart's motion for summary judgment, I do not have the benefit of whatever argument Murray might make in opposition to Walmart's claim that he was overpaid. Murray's complaint refers to a demand he sent Walmart in June 2017, Second Am. Compl. ¶ 60B (ECF No. 159), which presumably would have explained what he believed he was owed then and why, but neither party has entered that document into the record.[18] A Walmart request for admission asked Murray to identify the amount he claims Walmart failed to pay him in violation of 26 M.R.S.A. § 626; Murray responded only that he "has never received a comprehensive worksheet" detailing the violation. Pl.'s Resp. to Defs.' Request for Admissions at 20-21 (ECF No. 226-5). In short, Murray has provided no evidence of unpaid wages.

Since there is no evidence in the record to support Murray's claim for unpaid wages, Walmart is entitled to summary judgment on that issue.

## MOTION TO SEAL

The final issue I must decide involves Walmart's motion to seal many of its summary judgment filings. Defs.' Mot. to File Under Seal (ECF No. 198). Murray opposed the motion, and the parties fully briefed the issue. See Pl.'s Obj. to Mot. to Seal (ECF No. 201); Defs.' Reply in Support of Mot. to Seal (ECF No. 204); Pl.'s Opp. to Defs.' Reply (ECF No. 212). The Magistrate Judge, after an *in camera* review, granted much of Walmart's motion to seal but denied the motion with respect to three documents: the motion itself (ECF No. 198) and two email chains

---

[18] Parts of this letter were read in Murray's second deposition, but not enough of it to understand what specific arguments the letter may have made. See Murray Dep. (second) at 24:25-38:2 (ECF No. 198-15). Murray testified that the dollar amount demanded in the letter was no longer accurate, and he declined to provide an accurate number. Id. at 25:13-26:3.

between Murray and Busby (ECF Nos. 198-9 & 198-13). Mem. Dec. & Order on Mot. to Seal at 1 (ECF No. 242). The Magistrate Judge found the remaining documents contained confidential business, personal, or third-party information that warranted protection, at least at the pre-trial stage. Id. at 3-4. Walmart re-filed the three non-protected documents on the public docket. Defs.' Add'l Attachments (ECF Nos. 244, 244-1 & 244-2). Murray objected to the Magistrate Judge's decision, Obj. to Order on Mot. to Seal (ECF No. 243), and Walmart filed a response, Response to Obj. (ECF No. 245).

Murray's objection to the order rests on the same argument he made in opposing Walmart's original motion to seal: that the public has both a common law and First Amendment right of access to Walmart's filings. While Murray correctly recounts the caselaw regarding the public's right of access in general, he does little to explain why the Magistrate Judge's order—which expressly cited and considered that caselaw—was incorrect with respect to the particular documents at issue here. He does not explain why the Magistrate Judge was wrong when he found that the protected documents contained confidential business, personal, or third-party information—or why the public's right of access should overcome the documents' confidentiality.

The Federal Rules require that I set aside the Magistrate Judge's order only if it "is clearly erroneous or is contrary to law." Fed. R. Civ. Pro. 72(a). Murray has not shown that the order was clearly erroneous or contrary to law.

### CONCLUSION

After viewing the facts in the light most favorable to Murray, I conclude that the evidence would not permit a jury to find that Walmart fired him because

of his protected activities or that it discriminated against him based on his age or disability. Likewise, Murray has provided no evidence of the amount of any unpaid wages or benefits Walmart owed him. For these reasons, I **GRANT** Walmart's motion for summary judgment. I **DENY AS MOOT** Murray's motion for partial summary judgment. I **AFFIRM** the Magistrate Judge's order on Walmart's motion to seal.

**SO ORDERED.**

**DATED THIS 6TH DAY OF DECEMBER, 2019**

/s/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**